**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GISELA GONZALEZ MERICAL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE JOINT CORP.,<br><br>Defendant. | Case No. 1:26-at-00703<br><br><u>CLASS ACTION COMPLAINT</u><br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT — JURY TRIAL DEMANDED

Plaintiff Gisela Gonzalez Merical ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against The Joint Corp. ("Defendant" or "The Joint").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all patients who booked an appointment for chiropractic care online through Defendant's website, www.thejoint.com (the "Website").

2.    Defendant is one of, if not the largest, providers of chiropractic treatment in the country.  Currently, there are over 950 chiropractic offices under the brand.[1]

3.    Patients maintain reasonable expectations of privacy related to their health information.  Despite these expectations, and Defendant's duty to safeguard the health information of its patients, Defendant supplies outside parties with the exact identity, and exact location, of every person who schedules an appointment for chiropractic care.

4.    Defendant has purposefully installed various tracking application programming interfaces into the code of its website to aid, employ, agree with, or otherwise enable several third parties – Google LLC ("Google"); Microsoft Corporation ("Microsoft"); The Trade Desk, Inc. ("TradeDesk"); and TikTok Inc. ("TikTok") (collectively, the "Third Parties") – to intercept patient communications as they fill out online appointment forms, including communications containing protected health information.  That is unlawful.

5.    Plaintiff brings this action for legal and equitable remedies for Defendant's violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; violation of the California Invasion of Privacy Act, Cal. Pen. Code § 631–632; and Invasion of Privacy under California's Constitution related to this unlawful conduct.

---

[1] *About*, THE JOINT, https://www.thejoint.com/our-story.

**JURISDICTION AND VENUE**

6.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under a law of the United States—the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because Plaintiff's state claims are so related that they form the same case or controversy.  Further, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action where the aggregate amount in controversy is in excess of $5,000,000.00, exclusive of interest and costs, there are at least 100 members of the putative class, and at least one member of the proposed class is a citizen of a different state than Defendant.

7.      The Court has specific personal jurisdiction over Defendant because The Joint has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities.  Specifically, Plaintiff accessed and navigated the Website while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's communications in this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and Plaintiff resides in this District.

**THE PARTIES**

*Plaintiff*

9.      Plaintiff Gisela Gonzalez Merical is an adult citizen of the State of California and is domiciled in Fresno, California.

10.      Plaintiff booked an appointment for chiropractic care on Defendant's Website on or around May 6, 2025.  When signing up to obtain chiropractic care through the Website, Plaintiff provided Defendant with her full legal name, phone number, email address, clinic of choice, and other information related to her appointment booking.  Plaintiff provided this sensitive information with the understanding that it would remain confidential between her and Defendant.  At no time

did Defendant obtain Plaintiff's prior consent to intercepting and disclosing her communications to outside Third Parties.

11. Upon accessing the Website, as alleged in greater detail below, Plaintiff's communications were intercepted in transit by the Third Parties – as enabled by Defendant – including communications that contained Plaintiff's personally identifiable information and sensitive appointment details. Neither Defendant nor the Third Parties procured Plaintiff's prior consent to intercepting and disclosing these communications.

12. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's personally identifiable information ("PII") and protected health information ("PHI").

***Defendant***

13. The Joint Corp. is incorporated in the State of Delaware and has its principal place of business in Scottsdale, Arizona. Defendant is "the leader in delivering chiropractic care, performing more than four million spinal adjustments a year."[2]

## FACTUAL ALLEGATIONS

**A.    Overview of The California Invasion of Privacy Act and the Federal Wiretap Act**

14. The California Legislature enacted the California Invasion of Privacy Act ("CIPA") to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

15. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

---

[2] *Id.*

16. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360–61 (1985) (emphasis added, internal citations omitted).

17. To establish liability under California Penal Code section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

18.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Cal. Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

19.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal Penal Code § 632(c).

20.     Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation of CIPA.

21.     Similar to CIPA, the Federal Wiretap Act ("ECPA") creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[3]

22.     Although the ECPA does not apply if a "person is a party to the communication or one of the parties to the communication has given prior consent to such interception[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[4]

### B.     Defendant's Website

23.     Defendant owns and operates the Website.  Unbeknownst to users, Defendant knowingly integrated the Google Analytics cookie and DoubleClick API, the TradeDesk's Adsrvr Pixel, the TikTok Pixel, and the Microsoft Bing Ads Tracker (collectively, the "Tracking Technologies") onto the Website to assist with its marketing efforts.

24.     When prospective patients access the Website, Defendant fails to inform them that it will disclose and assist Third Parties with intercepting their sensitive appointment information.

---

[3] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).
[4] 18 U.S.C. § 2511(c)–(d).

25.    Upon entering the Website, users can use dropdown menus to learn more about the chiropractic treatment of certain medical ailments and conditions, search for nearby clinics, and choose their own pricing plan.  New patients, for instance, are encouraged to claim a special "offer" consisting of a discounted "[c]onsultation, [e]xam, and [a]djustment."  *See* Fig. 1.



**Figure 1**

26.    Take a new prospective patient, for instance, who wishes to schedule a chiropractic appointment on Defendant's Website.  A user who "claims" Defendant's promotional offer is required to fill out form fields indicating their zip code, first and last name, email address, and phone number.  *See* Fig. 2.

**Figure 2**

27.    After providing Defendant with these details, the user is then able to schedule an appointment at the date, time, and location of their choice.  *See* Figs. 3–4.

//

//

//

//



**Figure 3**



**Figure 4**

28.    Unbeknownst to its patients, Defendant systematically discloses their sensitive and confidential appointment booking details, including their PHI and PII, to Third Parties.

29.    As courts across the country have recognized, the identifiers that the Tracking Technologies capture—email address, first and last name, unique identifiers, and User IDs— constitute "directly personal information." Nonetheless, Defendant discloses this information without its patients' knowledge or consent.

30.    Plaintiff had her PHI and PII intercepted by Third Parties in the same manner described when she booked an appointment on the Website.

C.    **Tracking Technologies, Generally**

31.    Web browsers are software applications that allow users to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

32.    Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the user's device via web browsers.

33.    Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses

may consist of a web page, another kind of file, text information, or error codes, among other data.

34.    A user's HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the user's screen as they navigate the Website).

35.    Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

36.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The Google tracking technologies, TradeDesk Adsrvr Pixel, the TikTok Pixel, and the  Microsoft Bing Ads Tracker, embedded on the Website by Defendant, constitute Source Code.

**D.    Google's Advertising Technology**

37.    Google is one of the most valuable publicly traded companies in the world, with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

38.    Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[5]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.  Google generated an even higher percentage of its total revenues from advertising in prior years:

//

//

//

---

[5] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|-----------|-------------|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

**Table 1**

39.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

40.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous Code, which allowed webpages to load faster and improved data collection and accuracy.

41.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more session initiated from one or more devices."

CLASS ACTION COMPLAINT — JURY TRIAL DEMANDED                                    12

### 1.    *The Google Analytics Tracking Code*

42.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

43.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

44.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[6]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[7]

45.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

46.    Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

---

[6] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[7] *Id.*

47.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the website pages and app screens that user visits), and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

48.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

49.    Google Analytics links with Google Ads, so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[8]  Such practices were in effect on Defendant's Website at all relevant times.

50.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted patients' interactions on the Website, including PII and protected health data.  Google received at least "Custom Events" and URLs that disclosed the appointment confirmation of patients.  Google also received additional PII, including patients' email address, name, phone number, IP address, device information, and User-IDs.

51.    Google collects vast quantities of consumer data through its tracking technologies.

52.    Due to the vast network of consumer information held by Google, it can match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity, without anything more.

53.    Google then uses such information through targeted advertising.

---

[8] *Connect Google Ads to Google Analytics*, GOOGLE, https://support.google.com/analytics/answer/9379420?hl=en.

### 2.    *The DoubleClick API*

54.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[9]

55.    DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[10]  The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and "DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[11]

56.    As relevant here, however, data is still sent from the Website to Google through the DoubleClick API.  This process is akin to a person setting an old e-mail address to automatically forward messages to a new e-mail address, rather than manually updating their contact information on a number of different websites.  Messages would still be sent to the old e-mail address, but would be routed to the same end recipient, the same way data sent to DoubleClick still ends up with Google.

57.    Once integrated into a website, the DoubleClick API allows a website owner to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[12]

58.    Once Defendant intercepts the Website communications through the DoubleClick API and discloses such information to Google (in real time), Google has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver

---

[9] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

[10] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google/products/marketingplatform/360/introducing-google-marketing-platform/.

[11] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

[12] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.

---

[] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against abuse and fraud, and personalize content and ads you see on Google and on [] partners' sites and apps."[13]

59.    For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

60.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on those habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and services they are interested in.

61.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

62.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

63.    Google views and processes every piece of information collected from the Google Analytics tracking technology and DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

64.    Google partners with Defendant in its marketing efforts.  The Google Analytics tracking technology and DoubleClick API are employed on the Website in the manner described throughout the Complaint.

_____

[13] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

**E.    TradeDesk's Advertising Technology**

65.    TradeDesk is a data broker.  While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[14] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

66.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[15]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."  And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[16]

67.    Data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers to track users across the internet.[17]  Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[18]

---

[14] JUSTIN SHERMAN, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY 2 (Duke Sanford Cyber Policy Program eds., 2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[15] *Id.* at 2.

[16] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROC. OF THE 2015 ACM CONF. ON ONLINE SOC. NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[17] *Id.* at 11.

[18] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

---

CLASS ACTION COMPLAINT — JURY TRIAL DEMANDED                                    17

68.    In short, TradeDesk is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles.  Through "cookie syncing," those profiles are shared by TradeDesk with other entities (and vice versa) to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interested advertisers through real-time bidding, where users command more value the more advertisers know about them.  Thus, TradeDesk enriches the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

69.    Accordingly, TradeDesk uses pixels in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to monetize websites by installing TradeDesk's pixels and allowing TradeDesk to collect as much information about users as possible (without consent).

70.    Of course, TradeDesk also benefits from this arrangement because websites and apps will want to employ TradeDesk's services to bring in more advertising revenue, meaning TradeDesk can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of TradeDesk's services.

71.    TradeDesk was founded in 2009 by Jeff Green with the intention of developing technology that would target the same consumer "across ad formats, including display, video, audio, native and social, on a multitude of devices, such as computers, mobile devices, and connected TV."[19]

---

[19] *Fact Sheet*, THETRADEDESK, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.thetradedesk.com/assets/general/TTD-Fact-Sheet_121718.pdf.

72. One of the ways TradeDesk is able to receive swaths of online user data is through a "Tracking Tag" "that is placed on a website to track visitor activity on the page . . ."[20]

73. The Tracking Tag that TradeDesk develops is its Adsrvr Pixel that TradeDesk calls a "Universal Pixel."[21]

74. "As its name suggests, the Universal Pixel allows management of multiple processes with just one pixel added to an entire website."[22] "Universal pixels are dynamic and help capture every website visitor no matter what page they're on."[23]

75. As such, TradeDesk is able to collect information on internet users' activity on a wide variety of websites through the use of its pixel.

76. Specifically, TradeDesk collects information used to identify individuals across the internet including, but not limited to, cookies, IP addresses, email addresses, HTTP headers that specify information such as type of browser, device and operating system information, location information, and other unique identifiers associated with web addresses.[24] In addition, TradeDesk collects information regarding the users' activity on websites and communications with websites in the form of full-string URLs and button click events. Finally, TradeDesk pairs this information to anything it has otherwise collected about the user and has compiled into a profile of the user.

77. Defendant knowingly and intentionally implemented TradeDesk's Adsrvr Pixel on its Website.

F.    The TikTok Pixel

78. TikTok offers a SaaS called "TikTok Pixel," which "helps businesses track the performance of their ads" by sending information from the business's website to TikTok, who then

[20] *Tracking Tags*, THETRADEDESK, https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsOverview.

[21] *Universal Pixel*, THETRADEDESK, https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsUniversalPixel#universal-pixel-syntax.

[22] *Id.*

[23] *Glossary–Universal Pixel*, THETRADEDESK, https://www.thetradedesk.com/us/glossary#terms-g.

[24] *Id.*

uses that information to optimize ad campaigns on TikTok and across the internet.[25]

79. The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

80. The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads. By employing TikTok to collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

81. In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[26] That information is sent automatically to TikTok.

82. The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

83. Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

84. On each page on Defendant's Website (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited (which contains the relevant details of a patient's scheduled appointment and their PII), an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

---

[25] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel.

[26] "About TikTok Pixel," https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2.

85. When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is because TikTok itself is collecting the content of any conversation. That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

86. Once TikTok intercepts website communications, it has the capability to use such information for its own purposes. TikTok's Commercial Terms of Service grant TikTok "a non-exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[27]

87. In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

88. One of TikTok's partners is The Joint. The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

### G. The Microsoft Bing Ads Tracker

89. The Microsoft Bing Ads Tracker, typically delivered from domains such as bat.bing.com, is a third-party behavioral tracking pixel embedded on the Website either directly in the page code or dynamically injected via a tag management platform. When a user visits the Website, the tracker establishes a connection to Microsoft's advertising and analytics servers,

---

[27] "TikTok For Business Commercial Terms Of Service" https://ads.tiktok.com/i18n/official/policy/commercial-terms-of-service.

transmitting a variety of data points including IP address, device type, browser version, geolocation data, and unique cookie or device identifiers.  This process occurs automatically upon page load, confirming that user activity is observed and recorded in real time for use in Bing's advertising network.

90.     Once activated, the Bing Ads Tracker assists in identity resolution by assigning a persistent identifier to each visitor, which can be recognized and matched across different websites, apps, and devices within Microsoft's advertising ecosystem.  This is achieved through methods such as cookie syncing, cross-device tracking, and the integration of hashed identifiers (e.g., email-based matches when available).  These methods enable Microsoft to connect behavioral data collected on the Website with broader user profiles across the web, creating a unified view of a user's online activity.

91.     From an advertising perspective, the Bing Ads Tracker enables Defendant to retarget prior Website visitors who have searched for chiropractic treatment, viewed specific nearby clinics, or explored the treatment of specific ailments (*i.e.* shoulder pain).  This targeting occurs through personalized ads shown across websites and apps participating in Microsoft's ad network.  In addition, Microsoft's audience modeling capabilities allow Defendant to build "lookalike" audiences, *i.e.* users who share similar behavioral traits and interests with its existing visitors, in order to expand campaign reach.

92.     The Bing Ads Tracker also facilitates Defendant's broader data monetization strategy by transforming real-time behavioral signals into actionable insights.  The collected data feeds into programmatic ad systems where advertisers bid to display relevant, personalized ads to high-value prospects.  By continuously optimizing these advertising segments based on traveler behavior, Defendant maximizes ad performance, increases booking conversion rates, and generates commercial value from the behavioral data gathered during user sessions.

93.     Defendant surreptitiously installed, executed, embedded, or injected the Microsoft Bing Ads Tracker onto users' browsers by copying a JavaScript code snippet and adding it to the Website.  When a user visits the Website, their browser executes the JavaScript code which sends

data about the user's interactions, including their communications and accompanying PHI and PII, to Microsoft's servers.

94.     At no time do online users intentionally communicate directly with the Microsoft Bing Ads Tracker; rather, the connection is automatically initiated in the background by the embedded third-party code.  As a result, Microsoft can and does silently intercept and log communications generated during a user's interaction with the Website in real time.

95.     The Microsoft Bing Ads Tracker was intentionally installed by Defendant onto the Website, in the manner described through the Complaint, at all relevant times.

**H.     Defendant's Use of the Tracking Technologies**

96.     Pursuant to agreements with Third Parties (*e.g.*, Google, TradeDesk, TikTok, and Microsoft), Defendant intentionally and voluntarily embedded the Tracking Technologies onto the Website.  As illustrated within this section, Defendant unlawfully disclosed Plaintiff's and putative class members' PII and confidential appointment details via the Tracking Technologies to Third Parties without consumers' consent.

97.     The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website user's communications and inputs to the corresponding User IDs, much like a traditional wiretap.

98.     For example, when individuals visit Defendant's Website via an HTTP request to Defendant's servers, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the user, along with Source Code (including the Tracking Technologies).

99.     Thus, Defendant is in essence handing its patients a tapped website and, once a webpage is loaded into the consumer's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—and instantaneously transmit those communications to the Third Parties.

100.     Third Parties —including Google, TradeDesk, TikTok, and Microsoft—offer companies, including Defendant, snippets of code they can install in web browsers of users logged

into their services.  These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and appointment information).

101.    Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, User-IDs, cookie identifiers, device identifiers, emails, phone numbers) and the "content" of these communications (the buttons, links, pages, full-length URLs, and tabs they click/view related to the services sought from Defendant).

102.    Defendant installs these Tracking Technologies despite its understanding that its customers reasonably expect their confidential medical information will be kept confidential and undisclosed to Third Parties.

103.    From the moment clients enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the Third Parties.

104.    When users access the Website, Defendant discloses the URLs of every page they visit, including during the booking process.  For example, if a Website visitor clicks on "Symptoms and Disorders" and selects the particular ailment (*i.e.* shoulder pain) they hope to treat, such information is disclosed. *See* Fig. 5 (Google disclosure).

//

//

//

//

//

//

//

//

//

//



**Figure 5**

105.    The disclosures go far beyond that, however.  The disclosed information also includes the precise clinic where treatment is to take place, along with the patient's unhashed email address, phone number, and full name.  Thus, Third Parties are readily able to identify the exact patient who seeks chiropractic care, and where they seek it.  *See* Figs. 6–7 (Google disclosures); Fig. 8 (TradeDesk disclosure); Fig. 9 (TikTok disclosure); Fig. 10 (Microsoft disclosure).

//

//

//

//

//

//



**Figure 6**

**Figure 7**



**Figure 8**



**Figure 9**



**Figure 10**

106.    As clearly shown in the figures, the Third Parties each receive information indicating that a new patient named "Alix Anderson" has booked a chiropractic appointment at Defendant's clinic in Culver City, California.[28]  *See* Figs. 6–10.

107.    Moreover, the Third Parties also are clearly shown that the patient's email address is "2180AA5233@aol.com" and her phone number is "(415) 104-5279", respectively.  *See id.*

108.    This information personally identifies the Website user as a patient of The Joint, and indicates she is seeking chiropractic care for shoulder pain.  Such detailed disclosure constitutes an egregious violation for any provider of healthcare.

**I.    Tolling**

109.    Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporations of the Tracking Technologies onto the Website.

110.    The Tracking Technologies are entirely invisible to a website visitor.

111.    Through no fault or lack of diligence, Plaintiff and putative class members were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

112.    Plaintiff and putative class members were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

113.    Defendant had exclusive knowledge that the Website incorporated the Third Parties' Tracking Technologies and yet failed to disclose to its users, including Plaintiff, that by scheduling appointments through the Website, their PII and appointment information would be disclosed to Third Parties.

114.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users PII and appointment information.  In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII and purchase information to

---

[28] Some Third Parties receive the precise wording indicating "Culver City" while others receive the "Clinic number" for that location (Clinic No. 31013), which equally identifies a chosen clinic.

unauthorized third parties.  Accordingly, Defendant is estopped from relying on any statute of limitations.

115.    Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

116.    The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as all persons in the United States who, during the Class Period, scheduled a chiropractic appointment on Defendant's Website (the "Class" or "Nationwide Class").

118.    Plaintiff also brings this action on behalf of all California residents who, during the Class Period, scheduled a chiropractic appointment on Defendant's Website (the "California Subclass or Subclass") (the Class and California Subclass collectively, the "Classes") (class members and subclass members, collectively "Class Members").

119.    Plaintiff reserves the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification.

120.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

121.    Excluded from the Class and Subclass is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

122.    Plaintiff is a member of the Classes she seeks to represent.

123. **Numerosity/Ascertainability.** The Classes are so numerous that joinder of all members is impractical. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's and Third Parties' records.

124. **Typicality.** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had her confidential health communications, intercepted and disclosed to Third Parties.

125. **Adequacy.** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

126. **Commonality and Predominance.** There are well-defined common questions of fact and law that exist as to all members of the Classes that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

    a)    Whether Defendant's acts and practices violated the ECPA;

    b)    Whether Defendant's acts and practices violated CIPA § 631;

    c)    Whether Defendant's acts and practices violated CIPA § 632; and

    d)    Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Subclass under the California Constitution.

127. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual

actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**
**COUNT I**
**Violation of the Federal Wiretap Act,**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of the Nationwide Class)**

128.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

129.    Plaintiff brings this claim on behalf of herself and members of the Class.

130.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

131.    The ECPA protects both the sending and the receipt of communications.

132.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the Act.

133.    The transmission of Plaintiff's sensitive and protected information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

134.    The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

135.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

136. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

137. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

138. The following instruments constitute "devices" within the meaning of the ECPA:

a) The computer codes and programs Defendant and Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b) The computer codes and programs Defendant and TradeDesk used to track Plaintiff's and Class Members' communications while they were navigating the Website;

c) The computer codes and programs Defendant and TikTok used to track Plaintiff's and Class Members' communications while they were navigating the Website;

d) The computer codes and programs Defendant and Microsoft used to track Plaintiff's and Class Members' communications while they were navigating the Website;

e) Plaintiff's and Class Members' browsers;

f) Plaintiff's and Class Members' mobile devices;

g) Defendant's and Google's web and ad servers;

h) Defendant's and TradeDesk's web and ad servers;

i) Defendant's and TikTok's web and ad servers;

j) Defendant's and Microsoft's web and ad servers;

k) The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

l) The plan that Defendant and TradeDesk carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

---

CLASS ACTION COMPLAINT — JURY TRIAL DEMANDED

m)    The plan that Defendant and TikTok carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

n)    The plan that Defendant and Microsoft carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

139.    Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

140.    By utilizing and embedding the Tracking Technologies provided by Google, TradeDesk, TikTok, and Microsoft on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

141.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Tracking Technologies provided by Third Parties on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to Third Parties.

142.    The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PHI and PII, including their identities and information related to their medical chiropractic appointments.  This confidential information is then monetized for targeted advertising purposes, among other things.

143.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Third Parties through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

144.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the

information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

145.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy.

146.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party who intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

147.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

### COUNT II
**Violation of the California Invasion of Privacy Act,
Cal. Penal Code § 631
(On Behalf of the California Subclass)**

148.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the members of the Subclass.

149.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

150.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

151.    The Third Parties' Tracking Technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

152.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device."  *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties have the capability to use the wiretapped information for their own purposes.  Accordingly, Google, TradeDesk, TikTok and Microsoft were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

153.    At all relevant times, by their Tracking Technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff

and Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

154. At all relevant times, Third Parties used or attempted to use the communications intercepted by their Tracking Technologies for their own purposes.

155. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Third Parties to wiretap Plaintiff and Subclass Members using the Third Parties' Tracking Technologies and to accomplish the wrongful conduct at issue here.

156. Plaintiff and Subclass Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Subclass Members' electronic communications. Nor did Plaintiff and Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

157. The wiretapping of Plaintiff and Subclass Members occurred in California, where Plaintiff and Subclass Members accessed the Website and where Third Parties – as enabled by Defendant – routed Plaintiff's and Subclass Members' electronic communications to Third Parties' servers.

158. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632
### (On Behalf of the California Subclass)

159. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

160. Plaintiff brings this Count individually and on behalf of the members of the California Subclass.

161. CIPA § 632(a) prohibits an entity from:

intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

162. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

163. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because Subclass Members had an objectively reasonable expectation of privacy with respect to their PHI and protected appointment information.

164. Plaintiff and Subclass Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's representations that these communications would remain confidential.  Plaintiff and Subclass Members did not expect Third Parties, and specifically Google, TradeDesk, TikTok, and Microsoft to secretly eavesdrop upon or record this information and their communications.

165. The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

166. By contemporaneously intercepting and recording Plaintiff's and Subclass members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

167. At no time did Plaintiff or Subclass members consent to Defendant or Third Parties conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

168.    The Third Parties utilized Plaintiff's and Subclass members' PHI and PII for their own purposes, including advertising and analytics.

169.    Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties.

170.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
### Invasion of Privacy Under California's Constitution
### (On Behalf of the California Subclass)

171.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Subclass.

172.    Plaintiff and Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their chiropractic health appointments and treatment; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Subclass Members' knowledge or consent.

173.    At all relevant times, by installing and embedding the Tracking Technologies' code into the Website so that Third Parties could intercept users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and Subclass Members' privacy rights under the California Constitution by disclosing their private information.

174.    Plaintiff and Subclass Members had a reasonable expectation that their communications about their health appointments and treatment, and other private information, would remain confidential and that Defendant would not enable Third Parties' interception of this sensitive information given that Defendant did not provide Plaintiff and Class Members with notice of its practice of disclosures.

175.    Plaintiff and Subclass Members did not authorize Defendant to record and transmit Plaintiff's and Subclass Members' private medical communications alongside their personally identifiable health information.

176.    This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private medical appointment communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

177.    Accordingly, Plaintiff and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a)    For a determination that this action is a proper class action;

b)    For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorney(s) as Class Counsel to represent the Class and Subclass;

c)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

d)    For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

e)    For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f)    For punitive damages, as warranted, in an amount to be determined at trial;

g)    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h)    For prejudgment interest on all amounts awarded;

i)    For injunctive relief as pleaded or as the Court may deem proper;

j)      For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k)      For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Classes, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: February 4, 2026                    Respectfully submitted,

                                           **BURSOR & FISHER, P.A.**


                                           By:      */s/ Sarah N. Westcot*
                                                        Sarah N. Westcot

                                           Sarah N. Westcot (State Bar No. 264916)
                                           701 Brickell Avenue, Suite 2100
                                           Miami, FL 33131
                                           Telephone: (305) 330-5512
                                           Facsimile: (305) 679-9006
                                           E-mail: swestcot@bursor.com

                                           *Counsel for Plaintiff*